## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 15 2020, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Ana Patricia Osan
David P. Matsey
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Cory A. Shoffner
Brody B. Shoffner
La Porte, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| C.G. and S.G., *Appellants-Petitioners,* <br><br> v. <br><br> B.L., *Appellee-Respondent* | January 15, 2020 <br><br> Court of Appeals Case No. 19A-AD-1172 <br><br> Appeal from the LaPorte Superior Court <br><br> The Honorable Richard R. Stalbrink, Jr., Judge <br><br> Trial Court Cause No. 46D02-1812-AD-44 |

**Altice, Judge.**

### Case Summary

[1] After nearly two years of having no contact or communication with his then-eight-year-old daughter K.C.L. (Child), B.L. (Father) filed a petition to modify

parenting time. Less than two months later, Child's stepfather C.G. (Stepfather) filed a petition to adopt Child, and S.G. (Mother) consented to the adoption. Stepfather alleged that Father's consent was not required, pursuant to Ind. Code § 31-19-9-8(a)(2)(A), because Father had failed without justifiable cause to communicate with Child for at least one year when able to do so. Father contested the adoption, arguing that he feared contacting Child during the period at issue due to protective orders Mother had filed against him and past violations that had resulted in him going to jail. Following a hearing, the trial court determined that Father's consent to the adoption was required because his failure to communicate with Child was justifiable. On appeal, Stepfather and Mother challenge several of the trial court's findings and conclusions as clearly erroneous and allege that the trial court ignored essential undisputed evidence.

We reverse and remand.

## Facts & Procedural History

Child was born to Mother and Father in September 2010, and the family lived together until about March 2011. Thereafter, paternity was established in March 2012, along with the issuance of a child support and parenting time order (the Paternity Order). The Paternity Order granted Mother sole custody of Child and provided for supervised parenting time at Harmony House in La Porte once Father was released from prison.

[4] In April 2012, Father began his three-year prison sentence for Class D felony domestic battery, a crime that he committed against Mother in February 2011. He also had a consecutive, suspended one-year term for intimidation under a separate cause. Father was incarcerated until August 2013 and then released to probation. Father visited with Child twice during his incarceration by arranging for his mother (Paternal Grandmother) to bring Child to the prison with Mother's consent.

[5] Upon his release in August 2013, Mother and Father worked together regarding parenting time and he spent time with Child at various locations around town, including Mother's house. He had another stint in jail from December 2013 to February 2014 and then visits resumed while he was on community corrections and GPS monitoring. By late 2014, Mother and Father were no longer on good terms because Mother had a new boyfriend and Father had been harassing and threatening her. Mother obtained a new protective order (the PO) against Father in October 2014,[1] which Father violated multiple times.

[6] Father returned to jail in December 2014 through March 13, 2015, on various charges of invasion of privacy.[2] After his release on bond, Father began supervised visits with Child at Harmony House in April 2015, pursuant to the

---

[1] The PO was issued for two years, expiring in October 2016. In 2011, Mother had sought and obtained protective orders against Father on three occasions in February, March, and September. The first two were dismissed after a short time at Mother's request, and the third expired in late 2013.

[2] Father ultimately pled guilty under two cause numbers to Level 6 felony stalking of Mother, Class A misdemeanor intimidation, and Level 6 felony escape. He received an aggregate sentence of three years to be served on work release. There was also a no contact order entered against him in favor of Mother.

Paternity Order. Cheryl Highsmith, the director of Harmony House, suspended parenting time in September 2015 based on Father's behavior toward staff and attempts to communicate with Mother in violation of the PO during visits. By February 2016, Father contacted Highsmith to resume parenting time and Highsmith agreed.

[7] On October 31, 2016, due to several no shows and late arrivals, Highsmith sent a letter to Father indicating that he must arrive thirty minutes early for scheduled visits or they would be cancelled. When Father arrived for a visit on November 10, 2016, the visitation facilitator informed him that the visit had been cancelled because he did not show up thirty minutes prior to its start time. Father became angry and "raced away screeching his tires leaving marks on the street." *Transcript* at 17. Later that day, Father called Harmony House and spoke with the visitation facilitator. He stated that "[Highsmith] can f*ck her visits and being there 30 minutes early." *Id*. Before hanging up, Father indicated that he would not be coming back to Harmony House.

[8] Harmony House never heard from Father after November 10, 2016, and at the end of that month, Highsmith sent a letter to Father indicating that Harmony House would no longer supervise parenting time for him due to his disrespectful and threatening behavior toward staff on more than one occasion. Father last saw Child at a supervised visit on October 27, 2016. According to Highsmith, had Father contacted her as he had in the past, he could have had his supervised visits at Harmony House reinstated.

[9] Father returned to jail in December 2016 to serve time for two separate criminal convictions – one for Class A misdemeanor battery (victim unclear) and the other for Level 6 felony invasion of privacy (against Mother). He was released on December 21, 2017. During this year in jail, Father did not see or attempt to communicate (directly or indirectly) with Child. Nor did he do so upon his release.

[10] In the meantime, Stepfather began living with Mother and Child in November 2016. They moved from Mother's home of several years on August 1, 2018, and Stepfather and Mother married on September 15, 2018.

[11] On October 10, 2018, after no communication with Child for nearly two years and within one month of Mother marrying Stepfather, Father filed in the paternity case a petition to modify parenting time. Thereafter, on December 3, 2018, Stepfather initiated the instant action by filing a petition to adopt Child with Mother's consent. The paternity action was then transferred to the court handling the adoption. Father filed a motion to contest adoption on December 12, 2018, and the matter was set for an evidentiary hearing on the issue of whether Father's consent was required.

[12] Mother, Father, and Highsmith testified at the hearing on March 11, 2019. Stepfather presented evidence that Father had not communicated with Child since November 2016 and had only recently sought to reestablish communication by the filing of his petition for modification in October 2018.

[13] Father did not dispute that he had gone well over a year without communicating with Child in any way. He claimed that he was afraid of getting into more legal trouble if he contacted Child because he would have to go through Mother, for whom he believed there was an active protective order.[3] Father testified: "I'm scared to death to contact this woman to be a father. I want to be a father. I want to do everything for my child. But I can't contact my child. She's eight years old." *Transcript* at 32. He continued, "I'm trying to do it the right way. And plus I've been arrested for this no contact so many times just from trying to be a father[.]". *Id.* at 36. Father opined, "I believe [Mother] does all she can to keep me from being a father. Every time I try, I go to jail. Every time." *Id.* at 92. Father acknowledged, however, that "a couple charges" involving Mother as his victim "never had anything to do with [Child]." *Id.* at 94.

[14] Mother testified that she "tried [her] hardest to let him be a dad" but "he never made it about [Child]." *Id.* at 65. Mother indicated that Father had a history of threatening and harassing her since the end of 2014 and that during the supervised visits at Harmony House he would try to communicate with her through Child and yell at her from one room to another during exchanges in violation of the PO. Father accumulated felony convictions for stalking,

---

[3] Father testified that he had no knowledge that the PO expired in October 2016 until he was advised by his attorney in August 2018. The trial court accepted Father's explanation "[b]ased on the volume of protective orders filed against Father as well as his time in and out of jail subsequent to October of 2016." *Appellant's Appendix Vol. II* at 8.

intimidation, and invasion of privacy against Mother beginning in 2014, which he committed after serving his prison sentence for the felony battery of Mother in 2011.

[15] At the conclusion of the hearing, the trial court took the matter under advisement and, on April 29, 2019, issued its order granting Father's motion to contest the adoption (the Order). The Order sets forth the trial court's reasoning as follows:

> 22. Based on the volume of protective orders filed against Father and the amount of times Father was punished for violating the protective orders, the Court finds that Father's fear of contacting the Child was genuine.[4] Additionally, based on the Child's age and Father's testimony, Father would likely have to contact Mother in order to contact the Child. Accordingly, these protective orders substantially affected Father's ability to communicate with the child.

> 23. While the Court recognizes that Mother's most recent protective order against Father expired in October of 2016, Father's lack of knowledge regarding its status seems probable in light of all of the circumstances.

> 24. Father also filed in October of 2018 to modify his parenting time with the Child. This occurred prior to Step-Father filing his petition to adopt the Child in December of 2018.

---

[4] Earlier in the Order, the trial court found: "In total, Father was charged at least nine times under separate causes for violating various protection/no contact orders for Mother since 2014. Father was found guilty and sentenced to approximately three years in aggregate for several of those offenses." *Id.* at 7.

25. Based on the fact that Mother had several protective orders against Father and Father believed until August of 2018 that one was in place, Father did not have the ability to contact the child without fear of legal consequences. This is a relevant consideration to establishing lack of communication.

26. Additionally, Mother brought the child to visit Father when he was previously incarcerated. However Mother did not bring Child to visit during his December 2016 to December 2017 incarceration. While the Court recognizes this would have been outside the scope of the March 2012 order regarding visitation, the fact that these type of visits occurred previously makes this fact relevant to the consideration of Mother thwarting or hampering contact between Father and the Child.

27. Based on the forgoing, Mother and Step-Father have not proved by clear and convincing evidence the criteria for allowing an adoption without consent.

*Id*. at 9-10. Stepfather and Mother now appeal from the Order, contending that Father's complete failure to communicate with Child for nearly two years was not justifiable and, thus, his consent is not required.

## Discussion & Decision

[16] "When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption." *In re Adoption of O.R.,* 16 N.E.3d 965, 972 (Ind. 2014) (quoting *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1194 (Ind. Ct. App. 2014), *trans. denied*). Moreover, we generally give considerable deference to the trial court's decision in family law matters because we recognize that the trial judge is in the best

position to judge the facts, determine witness credibility, "get a feel for the family dynamics," and "get a sense of the parents and their relationship with their children." *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005). Accordingly, we will not disturb such a ruling unless the evidence leads to but one conclusion, and the trial judge reached an opposite conclusion. *In re Adoption of O.R.,* 16 N.E.3d at 973. Our Supreme Court has explained:

> The trial court's findings and judgment will be set aside only if they are clearly erroneous. *In re Paternity of K.I.*, 903 N.E.2d 453, 457 (Ind. 2009). "A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment." *Id*. We will not reweigh evidence or assess the credibility of witnesses. *In re Adoption of O.R.*, 16 N.E.3d at 973. Rather, we examine the evidence in the light most favorable to the trial court's decision. *Id*.

*E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018).

[17] Generally, in Indiana, a petition for adoption of a child born out of wedlock requires written consent from the mother of the child and, if paternity has been established, also the father. I.C. § 31-19-9-1(a)(2). "Parental consent may, however, be dispensed with under certain enumerated circumstances." *E.B.F.*, 93 N.E.3d at 763. Relevant to this case, consent is not required where, for a period of at least one year, "[a] parent of a child in the custody of another person … fails without justifiable cause to communicate significantly with the child when able to do so[.]" I.C. § 31-19-9-8(a)(2)(A). "The burden to prove this statutory criterion is satisfied by clear and convincing evidence rests squarely upon the petitioner seeking to adopt." *In re Adoption of T.L.*, 4 N.E.3d

658, 662 (Ind. 2014). Further, "a determination on whether a petitioner's burden to prove non-custodial parent's failure to communicate is met is highly dependent upon the facts and circumstances of each particular case[.]" *E.B.F.*, 93 N.E.3d at 764-65.

[18] Here, it is undisputed that Father had zero communication with Child between November 2016 and October 2018, a period well in excess of a year. Thus, the sole question in this case is whether Father's complete lack of communication with Child for nearly two years was based on justifiable cause. The trial court found that it was for two reasons: 1) Mother thwarted communication[5] by not bringing Child to visit Father in jail during his December 2016 to December 2017 incarceration as she had when he was in prison and 2) Father genuinely feared contacting Child due to the PO and his history of violations.

[19] Father concedes on appeal that the first reason listed above is not supported by the record. The trial court erroneously found that Mother had brought Child to the prison for visits with Father during his incarceration for domestic battery in 2012/2013. On the contrary, Paternal Grandmother brought Child to these two visits with Father in prison based on Father's request and Mother's consent. The evidence establishes that Father did not seek similar visits with Child while in jail between December 2016 and December 2017. Thus,

---

[5] "Efforts of a custodian to hamper or thwart communication between parent and child are relevant in determining the ability to communicate." *In re Adoption of T.W.*, 859 N.E.2d 1215, 1218 (Ind. Ct. App. 2006).

contrary to the trial court's conclusion, there is no evidence that Mother thwarted or hampered contact between Father and Child while he was incarcerated.

[20]     That leaves us with Father's fear of legal repercussions if he contacted Child, which he claims justified his lack of communication starting in November 2016 and extending past his subsequent year-long stint in jail. We simply cannot agree with the trial court that Father's failure to have any communication with Child during this time was justified. The record establishes Father and Mother's tumultuous history of domestic abuse, intimidation, harassment, and violation of protective orders. Despite being victimized by Father, Mother allowed Child to visit him in prison with the help of Paternal Grandmother,[6] Mother facilitated visits after his release, and she regularly brought Child for visits at Harmony House after the PO was issued in October 2014. Thus, Mother established a pattern of making child available for Father to exercise parenting time, and Father knew how to see and communicate with Child without violating the various protective orders issued over the years.

[21]     It was not until Father stormed out of Harmony House in November 2016, never to attempt to reinstate services, and became incarcerated the following month that Father's communication with Child ceased. During his year in jail,

---

[6] The coordination of these visits occurred while there was an active protective order from 2011.

Father did not send a single letter, card, or gift to Child[7] and did not seek Paternal Grandmother's assistance, as he had in the past, to bring Child to the jail for a visit. Certainly, his ability to call Child was hampered because he would have to go through Mother, whom he believed he could not legally contact, but he made no other reasonable efforts to communicate with Child while in jail. Nor did he attempt to communicate with Child upon his release. Rather, he waited nearly ten months before he filed a petition with the paternity court to modify parenting time.[8] This petition came less than one month after Mother and Stepfather's marriage.

[22] The facts clearly and convincingly establish, contrary to the trial court's conclusions, that Father had the ability to have at least some communication with Child during the period in question but that he unjustifiably chose not to. *See In re Adoption of O.R.,* 16 N.E.3d at 974 (holding, where incarcerated father made no attempt for over a year to write a letter or communicate with child in any way, that the facts did not demonstrate that he was unable to communicate with child "but only that he chose not to investigate reasonable means of doing so" and, thus, his consent to the adoption was not required); *cf. Lewis v. Roberts,* 495 N.E.2d 810, 813 (Ind. Ct. App. 1986) (recognizing that incarceration

---

[7] Father claimed that he did not have Child's address because Mother moved, but the undisputed evidence was that Mother did not move until August 2018, which was after Father was released from jail and well after a year of no communication.

[8] Father testified that he hired counsel in March 2018 to address parenting time but that the attorney did not file any paternity pleadings. The trial court, however, did not make such a finding in the Order. In fact, the court's findings expressly indicate that Father waited until October 2018 to attempt to modify parenting time.

"unquestionably alters the means for significant communication" and holding that incarcerated father communicated significantly with child by writing two to three times a year, sending cards and gifts on holidays and her birthday, and expressing a desire to see child in prison (which mother refused)). Accordingly, we conclude that the trial court committed clear error in ruling that Father's consent to the adoption was required.

[23] Even where a natural parent's consent is not required, the trial court must still determine whether adoption is in the child's best interest. *In re Adoption of O.R.*, 16 N.E.3d at 974 (citing I.C. § 31-19-11-1(a)(1)); *In re Adoption of K.S.*, 980 N.E.2d 385, 389 (Ind. Ct. App. 2012) (observing that "a petition for adoption is not automatically granted" following a showing that a natural parent consent is not required).

> The purpose of Indiana's adoption statutes is to protect and promote the welfare of children by providing them with stable family units. On occasion we have observed that the relationship between parent and child is a bundle of human rights of such fundamental importance that adoption statutes, being in derogation of the common law, should be strictly construed in favor of a worthy parent and the preservation of such relationship. However, in evaluating the parent-child relationship, the best interest of the child is paramount and our main concern should lie with the effect of the adoption on the reality of the minor child's life.

*In re Adoption of K.S.*, 980 N.E.2d at 389 (internal citations omitted).

[24]     During the underlying proceedings here, the parties and the trial court focused on whether Father's consent to the adoption was required. The parties did not present evidence regarding the impact of the adoption on Child's life and whether the severance of her ties with Father would be in her best interest. Accordingly, we remand to the trial court to determine whether the adoption will be in Child's best interest.

[25]     Reversed and remanded.

Robb, J. and Bradford, C.J., concur.